UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        Case No. 17-CR-175

TORRENCE HARRIS, SR.,

    Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman and Elizabeth M. Monfils, Assistant United States Attorneys, and the defendant, Torrence Harris, Sr., individually and by attorney Mark Richards, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in eight counts of a 27-count superseding indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846; and Title 18, United States Code, Sections 922(g)(1), 924(a)(2), and 2.

3.     The defendant has read and fully understands the charges contained in the superseding indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT ONE

### THE GRAND JURY CHARGES THAT:

1. Beginning by at least August 2015, and continuing until on or about September 27, 2017, in the State and Eastern District of Wisconsin and elsewhere,

*TORRENCE HARRIS, SR., a/k/a "T-Mack,"*
*TERRANCE HAMLIN, a/k/a "T-Bone,"*
*ROYEL PAGE, and*
*JOSEPH DAVIS, JR.,*

*knowingly and intentionally conspired with each other, and with persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).*

2. *The amount involved in the conspiracy attributable to each defendant as a result of his own conduct, and the conduct of other co-conspirators reasonably foreseeable to him, is 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and fentanyl and cocaine, both Schedule II controlled substances.*

*All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B), and Title 18, United States Code, Section 2.*

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a

reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

### *Background and Court-Authorized Interceptions*

*During the course of this investigation, various district court judges signed orders authorizing the interception of communications over telephones used by Terrance HAMLIN and Torrence HARRIS. Interception of wire communications over telephone number (414) 745-xxxx, Target Telephone #1, used by HAMLIN, began on March 30, 2017, and continued until June 29, 2017, with the exception of a few days. During the court-authorized monitoring of these communications, more than 4,285 intercepted telephone calls and text messages to or from Target Telephone #1 were deemed pertinent and criminal in nature. These intercepted communications confirmed that Terrance HAMLIN obtained heroin and/or cocaine from Torrence HARRIS. HAMLIN, in turn, distributed the narcotics to mid-level distributors as well as suspected street-level users.*

*After obtaining communications over HAMLIN's phone, agents were able to determine that HARRIS was using the telephone number (904) 654-xxxx, Target Telephone #3, and the authorization of interception of wire communications over this telephone was authorized on April 28, 2017. From April 28, 2017 through September 19, 2017, with the exception of a handful of days, the interception of wire communications were also authorized over the following telephone numbers, all believed to be used by HARRIS: (904) 738-xxxx, Target Telephone #5; (262) 307-xxxx, Target Telephone #7; (773) 398-xxxx, Target Telephone #12; (262) 289-xxxx, Target Telephone #13; (773) 383-xxxx, Target Telephone #14; (312) 931-xxxx, Target Telephone #16; and (414) 399-xxxx, Target Telephone #17. During the court-authorized monitoring of these communications, more than 1,213 intercepted telephone calls and text messages to or from Target Telephones ## 3, 5, 7, 12, 13, 14, 16, and 17 were deemed pertinent and criminal in nature. These intercepted communications confirmed that HARRIS distributed narcotics to several mid-level distributors.*

*Case agents also discovered that, in addition to the above, HARRIS used multiple telephone numbers, both known and unknown to case agents. For example, on June 14, 2017, case agents conducted surveillance of HARRIS. During this surveillance, HARRIS was observed speaking on a flip-type cellular telephone. Case agents did not intercept any activity over Target Telephone #3, Target Telephone #5, or Target Telephone #7. Minutes later, HARRIS was observed speaking on a smart cellular telephone. Again, case agents did not intercept any activity over the above referenced Target Telephones. Subsequent toll analysis revealed that there was no activity over Target Telephone #12 either, leading case agents to believe that HARRIS used at least five cellular telephones at that particular time. Case agents are aware that narcotics traffickers often use multiple telephones in an attempt to thwart law enforcement's efforts at identifying them, their customers, and/or suppliers.*

*The investigation further revealed that codefendants M. DAVIS and KELLY served as couriers for Torrence HARRIS, and delivered controlled substances to narcotics customers at the direction of HARRIS. On numerous occasions, HARRIS directed narcotics customers to particular locations to conduct a narcotics transaction. Shortly thereafter, M. DAVIS and/or KELLY arrived*

3

to either conduct or assist with the transaction. HARRIS communicated with M. DAVIS and KELLY on separate and individually designated telephones. DAVIS and KELLY also had access to the drug trafficking organization's (DTO) stash location, controlled by HARRIS, at 22XX N. Martin Luther King Drive, Apartment B41, Milwaukee, WI.

### Torrence HARRIS

As an example, on April 2, 2017, Royel PAGE, a mid-level narcotics distributor, called HAMLIN and asked for a quantity of heroin ("45 CDs"). Immediately after speaking with PAGE, HAMLIN called HARRIS and said, "I need some snake shoes." HARRIS asked, "One pair of shoes?" HAMLIN replied, "No, two." Based upon a previous controlled purchase of heroin, case agents know that this quantity represented 50 grams of heroin (each pair corresponding to 25 grams of heroin). HARRIS said, "Come on 22nd and...let me call you right back, just answer the phone." HARRIS called HAMLIN from a different telephone and advised he was on N.22nd Street and W. Chambers. HAMLIN asked, "Hey, we had our best shoes?" 'Cause that's what's got me spinning the records." HARRIS replied, "It's the same thing, we all good." HARRIS directed HAMLIN to N 22nd Street between W. Chambers Street and W. Locust Street, and advised that HAMLIN would see HARRIS' car. At approximately 3:35 p.m., case agents observed HAMLIN operating his blue Chrysler Town and Country minivan with no registration plates displayed at N.22nd Street and W. Chambers. HAMLIN parked his vehicle and met with a black male believed to be HARRIS at this location.

Immediately after meeting with HARRIS, HAMLIN called PAGE and asked, "You got a calculator with you?... Nothing to figure it out?" PAGE replied, "Naw, not even close." HAMLIN advised he would need to come back to see PAGE. Case agents believe HAMLIN asked if PAGE had scales and repackaging material so that HAMLIN could provide the exact amount of heroin that PAGE requested. Because PAGE did not, HAMLIN needed to travel to a location so that he could weigh and repackage the narcotics. At approximately 4:15 p.m. HAMLIN called PAGE and advised that he was on his way to meet PAGE. At approximately 4:19 p.m., case agents observed PAGE enter the passenger side of HAMLIN's minivan. A short time later PAGE exited the minivan and entered his residence. Based upon their training, experience, and familiarity with the investigation, case agents believe that HAMLIN delivered 50 grams of heroin to PAGE which HAMLIN had obtained from HARRIS.

On July 31, 2017, HARRIS received a telephone call from an unidentified male (UM). The UM asked if HARRIS still had a type of heroin HARRIS had previously sold ("Hey, you still got that dark, huh?"). HARRIS advised he had a different type of heroin ("Got something else."). When The UM asked if it was "lighter," HARRIS confirmed. On August 3, 2017, the UM called HARRIS and said, "I need to meet with you, dog." The UM advised he was in the area of N. 68th Street and W. North Avenue. At 7:50 p.m., HARRIS advised he was about to pull up "right now." Fifteen minutes later HARRIS called the UM and stated, "He said he down at the Skybox." The UM could either meet "him" at the Skybox or "wait for him to come up." When the UM advised he wanted to wait for him to come up, HARRIS replied, "Alright, I'll tell him to come to the shop then." Case agents believe HARRIS met with the UM so that the UM could first provide money to HARRIS for the narcotics the UM wished to purchase. After receiving the money, HARRIS told the UM to meet HARRIS' courier ("him") near the Skybox Sports Bar. Because the UM did not

4

want to drive that far, HARRIS told the UM to meet HARRIS' courier at Kings and Queens Full Service Salon ("the shop"), 37XX W. North Avenue, Milwaukee, Wisconsin.

On this same date, case agents established surveillance near Kings and Queens Full Service Salon and observed a Chrysler 300 bearing Wisconsin registration 677-XYZ parked facing eastbound in front of the salon. A review of Wisconsin Department of Transportation records at the time revealed the license plates registered to co-defendant Anyssia CURRIE with no vehicle associated. Case agents have observed this Chrysler numerous times in front of the salon, near the Skybox Sports Bar, and in the area of narcotics transactions arranged by HARRIS. Based upon previous surveillance, case agents know it was driven by co-defendant M. DAVIS, the boyfriend of CURRIE, and a close associate of HARRIS. The UM called and informed HARRIS that the UM was near the salon and said he saw "the ride they was in but I don't see him up in here." Based upon their training, experience, and familiarity with the investigation, the UM referred to the Chrysler, and that the UM had obtained narcotics from the operator of the Chrysler in the past. HARRIS told the UM that he had just spoken to his couriers and that they would be arriving in "a tan Lexus." A short time later, case agents observed a tan Lexus parked directly in front of the salon, and a skinny black male approached the passenger side of a nearby vehicle. Case agents have also observed a tan Lexus bearing Wisconsin registration 942-ZTT numerous times in front of the salon, near the Skybox Sports Bar, and in the area of the narcotics transactions arranged by HARRIS, and know it to be operated by co-defendant Fontae KELLY. Based upon their training, experience, and familiarity with the investigation, case agents believe KELLY arrived in the tan Lexus to distribute the narcotics, at the direction of HARRIS, to the UM.

On August 9, 2017, HARRIS, on Target Telephone #13, received a call from HAMLIN. HARRIS stated, "Bone, down here at the Box. Come on." HAMLIN replied, "Oh, okay, two gray shoes." HARRIS stated, "Come on, man." At 11:33 a.m., HARRIS, on Target Telephone #13, received a call from HAMLIN. HARRIS advised, "Go in Playmaker's parking lot." HAMLIN stated, "Huh?" HARRIS repeated himself, "Go in Playmaker's parking lot." HAMLIN replied, "I'm already here." HARRIS stated, "Alright."

Through previously intercepted communications case agents determined that the term "gray shoes" is code language used to refer to a quantity of heroin, each pair of shoes representing an ounce of heroin. Therefore, case agents believed that HAMLIN requested to purchase 50 grams of gray heroin ("two gray shoes") from HARRIS. HARRIS directed HAMLIN to the parking lot of Playmakers Sport Center, 22xx N. Doctor Martin Luther King, Milwaukee, Wisconsin, where HARRIS frequently conducted narcotics transactions.

On September 17, 2017, HARRIS received a telephone call from another unidentified male (UM) asking to obtain narcotics from HARRIS. HARRIS asked, "How you want to do this?" The UM said, "I finna call my man, see where he at, have him, uh, you know how we usually do it...Skybox...Twice though, baby." HARRIS later advised the UM, "I'm waiting on you, whenever you call we all good." Based upon their training, experience, and familiarity with the investigation, case agents believe the UM has purchased narcotics from HARRIS in the past near the Skybox Sports Bar. During this conversation, the UM requested double the amount of narcotics the UM typically obtained ("Twice though baby."). Based upon location data for HARRIS' phone, and intercepted communications, case agents were aware that at the time HARRIS was in Atlanta, Georgia for the Packers game.

5

*On this same date, case agents established surveillance in the area of the Skybox and observed a Ford Flex parked in the lot to the north of 22XX N. Martin Luther King Drive. KELLY arrived in the aforementioned gold Lexus (942-ZTT) and M. DAVIS arrived in a silver Mercedes (677-XYZ); both parked in the lot on the southeast corner of W. Garfield Avenue and N. Martin Luther King Drive. KELLY walked into the front door of 22XX N. Martin Luther King Drive and M. DAVIS walked on the east side of the building and into the lot north of 22XX N. Martin Luther King Drive. M. DAVIS entered the front passenger seat of the Ford Flex and exited a short time later. M. DAVIS and KELLY then met in the lot where their vehicles were parked.*

*Shortly thereafter, HARRIS had voice and text contact with two additional unidentified males, directing both to the lot north of 22XX N. Martin Luther King Drive. Case agents subsequently observed M. DAVIS enter the rear seat of an Infiniti for a brief period. M. DAVIS exited the Infiniti and entered the front door of 22XX N. Martin Luther King Drive. A short time later, M. DAVIS exited 22XX N. Martin Luther King Drive and re-entered the rear seat of the Infiniti. Upon exiting the Infiniti, M. DAVIS then entered the front passenger seat of the Chrysler 200 in the same parking lot. M. DAVIS remained in the Chrysler 200 for a short time before he exited.*

*On September 18, 2017, HAMLIN called HARRIS to obtain narcotics. HARRIS advised, "Little brother around there." HAMLIN replied, "Alright, little dude, is that….is she around?" HARRIS acknowledged. HARRIS directed HAMLIN to "the Skybox." Based upon their training, experience, and familiarity with the investigation, case agents believe HARRIS advised he had both heroin ("little dude") and cocaine ("she") available for HAMLIN to purchase. Case agents also know that cocaine is often referred to as female ("she"). Based upon location data for HARRIS' telephone as well as intercepted communications, case agents knew HARRIS was traveling back from Atlanta. At the time HARRIS was in contact with HAMLIN, HARRIS was in Chicago, Illinois. Case agents conducted surveillance in the area of the apartment at 22XX N. Martin Luther King Drive, and observed KELLY in his gold Lexus parked in the lot north of 22XX N. Martin Luther King Drive. M. DAVIS arrived in his silver Mercedes, parked to the south of 22XX N. Martin Luther King Drive, and walked around the east side of the building where he met with KELLY. KELLY appeared to use a key to gain entry into a door on the east side of the building at which time he and M. DAVIS entered. A short time later HAMLIN called HARRIS and advised that he was in the "Playmakers" parking lot, which case agents know through investigation to be the lot to the north of 22XX N. Martin Luther King Drive. Case agents observed KELLY and M. DAVIS exit apartment B41 inside 2200 N. Martin Luther King Drive, walk down the east stairwell, and exit the east side of the building. KELLY and M. DAVIS walked to the Playmakers parking lot out of view of case agents. KELLY and M. DAVIS eventually re-appeared at KELLY's Lexus, and the vehicle departed the area.*

*Based upon their training, experience, familiarity with the investigation, intercepted calls, and surveillance, case agents believe HARRIS arranged narcotics transactions and used M. DAVIS and KELLY as his couriers and/or lookouts. Case agents further believe that KELLY and M. DAVIS, at the direction of HARRIS, obtained narcotics from 22XX N. Martin Luther King Drive, #B41 and distributed it to narcotics customers.*

6

*On September 27, 2017, search warrants were executed at 7243 W. Marine Drive, Milwaukee, Wisconsin, HARRIS' residence, and at 22XX N. Martin Luther King Drive, B41, the stash location. At HARRIS' residence, authorities recovered the following: a total of approximately $69,211 in drug proceeds and in HARRIS' Chevrolet Impala authorities recovered rent payment receipts for "B41."*

*From Apartment B41, authorities recovered the following: 10 ounces of heroin, 33 grams of fentanyl, a kilo press, a grinder, and a Glock 22, .40 caliber pistol. The pistol was recovered in kitchen cabinet above the sink with heroin.*

*Case agents also know from a review of the intercepted calls between HARRIS and HAMLIN that HARRIS would call HAMLIN and check with HAMLIN in order to make sure HAMLIN was all right. Case agents further know that during the course of the conspiracy HAMLIN wanted to meet with HARRIS in person to advise HARRIS about information he learned relevant to HARRIS' on-going drug trafficking activities.*

*Conservatively estimated, HARRIS is responsible for the distribution of at least one kilogram but less than three kilograms of a mixture and substance containing heroin, at least 32 grams but less than 40 grams of a mixture and substance containing fentanyl, and an unspecified amount of cocaine because these amounts were reasonably foreseeable to him based on his own or the co-conspirators' jointly undertaken criminal activity.*

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

**PENALTIES**

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: Count One, 40 years and a $5,000,000 fine. The Count also carries a mandatory minimum of five years of imprisonment, a mandatory special assessment of $100, and at least five years of supervised release.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss the remaining counts of the superseding indictment at the time of sentencing.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

9. The parties understand and agree that for the penalties in 21 U.S.C. §§ 841(b)(1)(B) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 100 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

10. The parties understand and agree that in order to sustain the charge of 21, U.S.C. §§ 841(a)(1) and 846, conspiracy to possess with intent to distribute or to distribute a controlled substance as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

First, the conspiracy, as alleged in the superseding indictment, existed; and

Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy.

## SENTENCING PROVISIONS

11. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13. The defendant acknowledges and agrees that his attorney has discussed the potentially applicable sentencing guidelines provisions with him to the defendant's satisfaction.

14. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

15. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

16. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

9

17. The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least one kilogram but less than three kilograms of a mixture and substance containing heroin, a Schedule I controlled substance, and at least 32 grams but less than 40 grams of a mixture and substance containing fentanyl, and an unspecified amount of cocaine, both Schedule II controlled substances.

### Base Offense Level

18. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One, using the drug conversion table and converting all controlled substances to marijuana, is 30 under Sentencing Guidelines Manual § 2D1.1(c)(5).

### Role

19. Pursuant to Sentencing Guidelines Manual § 3B1.1(a), the parties agree to recommend to the sentencing court that a 4-level increase be given for an aggravating role in the offense, as the defendant was an organizer or a leader of criminal activity that involved five or more participants.

### Weapons

20. The parties agreed to recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2D1.1(b)(1) is applicable to the offense level for the offense charged in Count One because the offense involved a firearm.

### Acceptance of Responsibility

21. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction

under § 3E1.1(a), the government may make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

### Sentencing Recommendations

22. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

23. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

24. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

### Court's Determinations at Sentencing

25. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

**FINANCIAL MATTERS**

27. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

28. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

**Forfeiture**

29. The defendant agrees that the property listed in the superseding indictment constitutes the proceeds of the offense to which he is pleading guilty, or were used to facilitate such offense. The defendant agrees to the forfeiture of those properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in the listed property. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

### Special Assessment

30. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### DEFENDANT'S WAIVER OF RIGHTS

31. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights that include the following:

   a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

   e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

32. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

35. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict

14

Case 2:17-cr-00175-PP    Filed 03/12/21    Page 14 of 17    Document 509

rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

36. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all

charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 3-2-21

TORRENCE HARRIS, SR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 3-2-21

MARK RICHARDS
Attorney for Defendant

For the United States of America:

Date: 3/12/21

RICHARD G. FROHLING
Acting United States Attorney

Date: 3/12/21

GAIL J. HOFFMAN
ELIZABETH M. MONFILS
Assistant United States Attorneys

17